# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF MISSISSIPPI
# GREENVILLE DIVISION

**ANDREW JAMES AND JANELL JAMES**                                                               **PLAINTIFFS**

**VS.**                                          **CIVIL ACTION NO: 4:18-cv-00005-MPM-JMV**

**CITY OF GREENVILLE, TERRACE WIGFALL,**
**MICHAEL MUIRHEAD, OFFICER HOOVER,**
**DAVID MASON, AND MARY MASON**                                        **DEFENDANTS**

## ORDER

This cause comes before the court on the motions of defendants to dismiss and/or for summary judgment. Plaintiffs Andrew and Janell James have responded in opposition to the motions, and the court, having considered the memoranda and submissions of the parties, is prepared to rule.

This case arises out of a January 21, 2015 auto accident involving plaintiff Andrew James ("James") and Terrance Wigfall. At the time of the accident, Wigfall was driving his personal vehicle on his way to work as a City of Greenville police officer, and, as discussed below, plaintiffs do not appear to dispute that he was off-duty at the time of the accident. James suffered broken vertebra in the collision with Wigfall's vehicle, leaving him partially paralyzed, and, on January 8, 2018, he and his wife Janell filed this action in this court, asserting both federal and state claims arising out of the accident. Defendants have presently sought to dismiss this case for lack of prosecution, and they also seek summary judgment based on arguments that plaintiffs' claims are substantively without merit.

From reviewing the record, it seems clear that there have, in fact, been very serious deficiencies in the prosecution of this case. Indeed, Magistrate Judge Virden entered a Report on March 3, 2020 which found numerous deficiencies in the prosecution of this case by plaintiffs'

1

counsel, including repeated failures to comply with case management deadlines and the failure to properly secure *pro hac vice* counsel. Most disturbingly, Judge Virden found that:

> On February 21, 2020, defendants filed a motion to dismiss for failure to prosecute. Doc. #104. Mr. Graham, still not properly admitted, nevertheless filed a response to the motion purportedly signed by Herbert Lee, who, as noted above, has long since been deceased.

[Virden report at 3].

While this court is very concerned about the conduct of plaintiffs' attorney as described in the motion to dismiss and in Judge Virden's findings of fact, it concludes, for the reasons discussed below, that plaintiffs' federal claims are substantively without merit and due to be dismissed with prejudice, irrespective of the defects in the prosecution of this case. In explaining its reasons for so concluding, this court will first address plaintiffs' claims against Wigfall. While plaintiffs have seen fit to assert federal constitutional claims against Wigfall, they offer no rebuttal to defendants' argument that, since Wigfall was driving his own personal vehicle while off duty, he was not acting "under color of state law" within the meaning of 42 U.S.C. § 1983 at the time of the accident. To the contrary, plaintiffs appear to tacitly concede defendant's arguments in this context, writing that:

> Moreover, the defendant argued that Wigfall committed the action while he was off-duty. If Officer Wigfall was off duty, [then] §1983 is not applicable to the case. Wigfall would be personally liable.

[Plaintiffs' brief at 9].

Plaintiffs are correct in stating that "if" Wigfall was off duty, then §1983 is not applicable in this case, and they offer no facts or even arguments suggesting that he was, in fact, on duty. Indeed, as discussed below, plaintiffs appear to assume that Wigfall was, in fact, off duty at multiple points in their briefing, and this court regards this assumption as correct. While it is true that Wigfall was on his way to work at the time of his accident, plaintiffs offer no authority

2

suggesting that the act of driving his personal vehicle to work is sufficient to render his actions "under color of state law" within the meaning of § 1983. This court therefore agrees with plaintiffs that § 1983 is inapplicable to the claims against Wigfall, and that is the only vehicle under which they might assert federal claims against him. While plaintiffs maintain that "Wigfall would be personally liable" notwithstanding § 1983's inapplicability, they are presumably referring to liability under state law, since § 1983 is the vehicle through which any federal claims would be asserted against Wigfall personally. This court finds defendants' arguments that Wigfall was not acting under color of state law at the time of the accident to be correct, and it will therefore dismiss the federal claims against Wigfall with prejudice.

This court next turns to plaintiffs' federal claims against defendants Muirhead and Hoover. These defendants were both active-duty Greenville police officers at the time of relevant events in this case, and plaintiffs allege that they sought to protect their fellow officer Wigfall by preparing a biased and inaccurate accident report. Specifically, plaintiffs argue in their brief as follows:

> The Officers attempted to falsify an accident report, make it consistent with Officer Wigfall's version of the accident, and hide the time the accident occurred. Officer Hoover was not at the accident scene. Yet, he claimed that he was the first at the scene. To be honest, he claimed to see the accident happen. Officer Hoover told Michael Muirhead that Officer Wigfall said that Andrew James was stopped in the road and with his ignition off. Officer Muirhead took a picture of keys in the console that go to a 15 passenger van, as if they were the keys to the car. The problem is the key to the car was stuck in the ignition switch. In fact, Janelle James had attempted to take the key out of the switch at the scene, but she could not remove them. Officers Hoover and Muirhead tried to cover up the fact that Officer Wigfall was the cause of the accident, and the time of the accident to make it seem that Wigfall was not on duty. They made false statements in the accident report. The making of a false statement in a state accident report is a felony offense. Miss. Code Ann. § 63-15-69.

[Plaintiff's brief at 9-10].

This court has not omitted record citations from this quotation of plaintiffs' brief above; to the contrary, they are missing from the original. This is a very serious omission which, standing alone, would justify a finding that plaintiffs had failed to offer factual support for their theory of liability against Muirhead and Hoover. Far more seriously, it appears to this court that counsel for plaintiffs has mis-stated a crucial fact quoted above which might support a conclusion that Muirhead and Hoover were intentionally seeking to mis-state facts in order to benefit Wigfall. Namely, plaintiffs write in their brief that "[t]o be honest, [Hoover] claimed to see the accident happen." [*Id.*] In the absence of any record citations for this proposition, this court has been forced to conduct its own inquiry into what plaintiffs might have been referring to, and it, through its staff, sent an e-mail to plaintiffs' counsel asking him to support this assertion with facts in the record. Consistent with his prior prosecution of this case, counsel for plaintiffs did not respond to this court's direct questioning in this regard. This is, standing alone, sufficient reason for this court to reject plaintiffs' "conspiracy theory" regarding the actions of Muirhead and Hoover in this case and to dismiss their federal claims against them. Nevertheless, in the interest of thoroughness, this court will note the results of its own inquiry into what Hoover actually said regarding whether he witnessed the accident.

In his deposition, Hoover testified that he was dispatched to the accident after it occurred, stating that:

> Q. Were you the first person on the scene?
> A. Yes, sir, I believe so.
> Q. You were first person on the scene? Tell me what you saw when you arrived on the scene?
> A. Well, prior to arriving on the scene I was dispatched to the accident. I was out on 82 to start with and when I approached the scene I observed something going -- headlights going around in circles and come down and hit the highway. And when I got to the scene it was a pickup driven by Wigfall.
> Q. You were -- you got a call to come to the scene?
> A. Yes, sir.

Q. How far from the accident scene were you when you got the call?
A. Less than a mile.

[Hoover depo. at 12-13].

Thus, Hoover clearly testified in his deposition that he did not see the accident occur, and plaintiffs' assertion to the contrary appears to be a blatant misrepresentation of the record. Once again, this misrepresentation itself constitutes sufficient reason to dismiss plaintiffs' claims against Muirhead and Hoover, particularly when considered in light of the numerous deficiencies in their prior prosecution of this case, as found by Judge Virden. Nevertheless, this court will also discuss the remaining facts alleged by plaintiffs in this context, none of which support a finding that Muirhead or Hoover deliberately mis-stated facts in the accident report in order to benefit Wigfall. In the accident report which he prepared, Officer Muirhead wrote that:

> I OFFICER MUIRHEAD WAS CALLED OUT TO WORK THE SCENE. THE CALL CAME OUT AT 0539 HOURS, OFFICER HOOVER WAS ON SCENE AT 0542 HOURS. I WAS CONTACTED BY PHONE AT 0551 HOURS AND ARRIVED ON SCENE AT 0627 HOURS. ONCE ON SCENE BOTH DRIVERS HAD ALREADY BEEN TRANSPORTED FOR TREATMENT. OFFICER HOOVER ADVISED BOTH DRIVERS WERE COHERENT AND HAD ONLY MINOR INJURIES. I WAS LATER ADVISED AT 0655 HOURS BY LT. REDMOND THAT D1 WAS BEING TRANSPORTED TO UMC IN JACKSON BY AIR EVAC. OFFICER CARPENTER MADE CONTACT AT DRMC PAVILLION TO GET D1 INFORMATION FOR THE REPORT BUT WAS UNABLE TO MAKE CONTACT WITH THE DRIVER. OFFICER HOOVER STATED THAT D1 ADVISED HIM THAT HE DID NOT KNOW WHAT HAD HAPPENED THAT HE WAS ON HIS WAY TO WORK AT THE PARCHMAN PRISON. OFFICER HOOVER ADVISED THAT D2 STATED THAT V1 WAS STOPPED IN THE ROADWAY AND HAD NO LIGHTS ON AND THAT HE NEVER SEEN V1. D2 HAD BEEN RELEASED FROM DRMC AS I ARRIVED AND I WAS ABLE TO MAKE CONTACT IN DRMC PARKING LOT AS HE WAS LEAVING. D2 STATED HE WAS SOUTHBOUND ON HWY 82 IN THE OUTSIDE LANE. D2 STATED THAT V1 DID NOT HAVE ON ANY LIGHTS AND WAS AT A COMPLETE STOP IN THE ROADWAY. D2 STATED HE DIDN'T SEE V1 UNTIL HE MADE CONTACT. AT WHAT APPEARS TO BE THE AREA OF CONTACT IN THE OUTSIDE LANE V1 WAS 243.3 FEET NORTH EAST OF AREA OF CONTACT. V2 WAS 388.1 FEET NORTH WEST OF AREA OF CONTACT. THERE WAS A LARGE DEBRIS FIELD AND SOME YAW MARKS BUT NO SKID MARKS. V1 WAS IN THE PARK POSITION AND THE KEYS OF THE VEHICLE WERE IN THE CENTER CONSOLE. OFFICER HOOVER STATED THE VEHICLE

5

> HAD NOT BEEN TAMPERED WITH. PHOTOGRAPHS HAVE BEEN ADDED TO EVIDENCE CONTROL #201501218499-A.

[Accident report at 2 (capitalization in original)].

After having carefully reviewed the report and plaintiffs' arguments, this court finds no genuine fact issue regarding whether Muirhead and Hoover intentionally falsified an accident report to favor Wigfall. While it is true that the accident report contains Wigfall's version of events which is very helpful to him, the accident report does not "vouch" for the truthfulness of Wigfall's self-serving testimony but merely quotes it. Obviously, having a participant in an accident offer a version of events which is helpful to himself is hardly extraordinary and serves as no basis for liability of an officer who merely quotes and records that version of events.[1] Moreover, the report also quoted James' version of events, namely that he "did not know what happened." This description of James' version of events is consistent with his deposition, in which he testified to having a very limited recollection of the accident. [Plaintiff's depo at 36-37]. At no point does the accident report quote James as having admitted to being parked on the street with no lights on, or any other facts which might expose him to civil liability.

With regard to the severity of James' injuries, the accident report quotes Hoover as stating that he only observed minor injuries on plaintiff, and plaintiffs emphasize this fact as proof that the report was biased in favor of Wigfall. However, this argument is greatly weakened by the fact that the very next sentence of the report notes that James "was being transported to UMC in Jackson by air evac." Obviously, the air evacuation of an accident victim is suggestive

---

[1] In his own deposition, Wigfall testified that the "brakes wasn't applied or anything, [on plaintiff's vehicle] so the vehicle had to be stationary." [Depo. at 32]. Counsel for plaintiffs appeared to have success in forcing Wigfall to retreat from this position and to admit that he couldn't actually see clearly whether plaintiff's vehicle was moving or not. [Depo. at 33]. Nevertheless, the fact that Wigfall made this contention at all in his deposition supports a conclusion that he would made the same claim to accident investigators on the scene. Wigfall testified that he could not recall what he had told investigators in this regard. [Depo. at 34].

of serious injuries, and Muirhead was careful to include this fact in the report. In the court's view, this goes a long way towards rebutting the notion that the report was intentionally slanted against plaintiff, since it defies logic that Muirhead, as the preparer of the report, would have included the fact if he was seeking to conceal the severity of plaintiff's injuries. Moreover, in his deposition, Hoover offered what this court regards as a reasonable explanation for his belief that plaintiff's injuries were minor, testifying that:

> Q. Did you have any conversation with [plaintiff] at all?
> A. Sir, only thing I said, "Are you hurt, sir?" And he said, "I don't know. I'm dazed." And he started moving around and I observed the vehicle and what was in it.
> Q. So you told Mr. Muirhead that both drivers was coherent and had only minor injuries?
> A. Yes, sir. On the scene, yes, sir. Both of them could talk to me.
> Q. How long did you talk to Mr. James? Long period of time?
> A. No, sir, just seconds.

[Hoover depo at 18].

Thus, Hoover testified that he only had very brief personal contact with James after the accident and that, during this encounter, plaintiff did not complain of any serious injuries. In their brief, plaintiffs note the undisputed fact that "[t]he accident broke Andrew James' T3 and T4 vertebra," but they offer no evidence or arguments suggesting that Officer Hoover should have known of these internal injuries during his very brief evaluation of plaintiff's condition. On a more fundamental level, it strikes this court as illogical that any police officer could have believed that the existence of serious injuries such as broken vertebra is something which he could conceal by simply stating that he only saw minor injuries. Obviously, the extent of plaintiff's injuries would eventually be determined by medical personnel, and not by an officer on the scene.

That brings this court to the mistake to which plaintiffs devote the most time in their brief, namely the report's inclusion of a photograph of the wrong set of keys. While this court

will accept, for the purposes of this motion, that the wrong set of keys were, in fact, photographed and included in the accident report, it is not at all clear exactly how this ties into the conspiracy theory which plaintiffs are attempting to advance. Plaintiffs do not suggest that the keys were "planted" by Hoover or Muirhead, to the contrary, they concede that "there was a set of keys that was in the console that belonged a 15 passenger ford van" which, James' wife testified, she used in her job and had left on the console. (Plaintiff's brief at 4; Depo of Janell James at 42). It thus appears to this court that the investigating officers saw this set of keys on the console and incorrectly assumed that they were the keys to the accident vehicle. In his deposition, Hoover testified that, during his brief observation of the vehicle, it was still dark and he didn't see any keys in the ignition and believed the keys on the console belonged to the accident vehicle. [Hoover depo. at 21].

While plaintiffs are thus able to establish an actual inaccuracy in the accident report, they offer no evidence suggesting that this was an intentional falsification which was made to aid Wigfall. Indeed, the issue of whether keys were in the ignition or on the dashboard strikes this court as having, at most, a tangential relevance to the question of liability for the accident, since keys can easily be removed from the ignition after an accident occurs. This is merely one of the logical flaws in plaintiffs' theory,[2] and likewise perplexing is their contention that Hoover and/or Muirhead mis-stated the time of the accident to support a conclusion that Wigfall was off duty. This is an odd contention, since plaintiffs have not contested defendants' contention that

---

[2] Indeed, this court notes there is no way in which officers might have reasonably hoped to get away with a deception of this nature, since it can be easily demonstrated that the photographed keys do not, in fact, match the accident vehicle. An acceptance of a conspiracy theory in this regard thus assumes that the defendant officers were both highly dishonest and lacking in basic common sense.

Wighall was, in fact, off duty at the time of the accident. Indeed, in Hoover's deposition, counsel for plaintiffs appeared to concede this point, stating that:

> Q. Did you all have -- at that time, did Greenville Police Department have a policy regarding investigating accident reports involving police officers?
> A. At that time he was not a police officer. He was off duty.
> Q. I understand he was off duty. But his job, he worked for the Greenville Police Department?
> A. Yes, sir.

[Hoover depo. at 14].

Similarly lacking in relevance and supporting evidence is plaintiff's contention that Hoover lied when he testified that, as far as he knew, he was the first on the accident scene after it occurred. In their brief, plaintiffs offer no proof indicating that Hoover's subjective belief in this regard is incorrect, and, ultimately, it strikes this court as being of little, if any, significance whether someone else arrived on the accident scene first. In the court's view, the crucial point is that Hoover did not contend that he had personally witnessed the accident, nor did he attempt to vouch for Wigfall's assertion that James' vehicle was parked on the street at the time of the accident. In the court's view, the fact that plaintiffs' counsel saw fit to blatantly mis-characterize the record regarding the facts in this regard suggests that he himself was aware that the facts as they actually exist fail to present a convincing "conspiracy theory" and that he needed to embellish the record with falsehoods. Once again, this court gave plaintiffs' counsel an opportunity to offer some other explanation for his actions, but he declined to do so. This court therefore finds plaintiffs' conspiracy theory against Hoover and Muirhead to be both factually unsupported and the product of affirmative misrepresentations of the facts, either of which would be sufficient to reject it.

While this court thus finds plaintiffs' theory of liability against defendants to be unpersuasive, it notes that they would be unable to demonstrate a right to recover under § 1983 even if the existence of fact issues in this regard were somehow presumed. In so stating, this court emphasizes that § 1983 is not a "catch all" provision providing for recovery in all instances of dishonest conduct by public employees. To the contrary, § 1983 only permits recovery in cases where plaintiffs are able to demonstrate a violation of the U.S. Constitution or of a federal law by someone acting under color of state law. Plaintiffs cite no federal law which is even arguably applicable in this context, and they cite no federal case law which supports recovery under facts even remotely analogous to the one here. In so stating, this court emphasizes that, since James was not the subject of an arrest or criminal prosecution in this case, the provisions of the Fourth, Fifth and Fourteenth amendments which protect the rights of criminal defendants do not apply. In the court's view, a plaintiff would have a much stronger claim in this context if the alleged falsifications in a police report arose in a context in which a local government was seeking to criminally prosecute him, since a prosecution brings many constitutional protections with it.

Given the absence of any arrest or criminal prosecution against James, it seems clear that, in order to recover against Hoover and Muirhead, plaintiffs would have to demonstrate a right to recover under the substantive due process clause of the Fourteenth Amendment. It is thus significant that, in *Albright v. Oliver* (and other decisions), the Supreme Court noted its reluctance to permit civil recovery under the substantive due process clause, writing that:

> We begin analysis of petitioner's claim by repeating our observation in *Collins v. Harker Heights*, 503 U.S. 115, 125, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992). "As a general matter, the Court has always been reluctant to expand the concept of substantive due process because the guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to

> bodily integrity. *See, e.g., Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 847–849, 112 S.Ct. 2791, 2804–2806, 120 L.Ed.2d 674 (1992). (describing cases in which substantive due process rights have been recognized).

*Albright*, 510 U.S. 266, 271–72, 114 S. Ct. 807, 812, 127 L. Ed. 2d 114 (1994).

Once again, plaintiffs allege that Hoover and Muirhead made inaccurate statements in a police report to favor a fellow police officer officer over James, and thereby harmed his right to seek civil recovery for tort injuries. In so doing, plaintiffs are asserting a very specific claim for which they fail to offer any applicable constitutional authority. It appears that, in essence, plaintiffs are alleging small town corruption and favoritism as part of an "old boy network" among police officers in Greenville. While there may well be legitimate arguments for the application of the substantive due process clause in this context, the fact remains that the U.S. Supreme Court has repeatedly expressed its reluctance to extend substantive due process into new areas such as this one. Moreover, both officers have raised qualified immunity defenses, and this means that plaintiffs are required to demonstrate both a constitutional violation *and* the fact that the existence of that violation was "clearly established" under the law. Plaintiffs have clearly failed to make this showing, and their federal claims against Hoover and Muirhead are therefore due to be dismissed.[3]

This court's now turns to plaintiffs' federal claims against the City of Greenville. It should be clear that this court's previously-stated conclusion that no constitutional violation was

---

[3] While plaintiffs have thus failed to demonstrate that the substantive due process clause is applicable in this context, this court notes that an officer who attempts to falsify an accident report under circumstances such as those which plaintiffs allege might well face serious consequences for this act. Indeed, this court notes that any such officer who falsifies information relating to an auto accident would face a serious risk that the injured party would seek legal counsel who would seek to demonstrate that the officers had lied in their report. Indeed, counsel for plaintiffs attempted to do just that in this case. Moreover, if counsel had persuaded this court that such intentional lies were made, then it would not have hesitated to point that out in its opinion. In that scenario, this court presumes that the officers involved would face the possibility of serious disciplinary action, including termination.

committed by any of the officer defendants in this case necessarily precludes any liability against the City in this regard. Indeed, it is well established that "[w]ithout an underlying constitutional violation, an essential element of municipal liability is missing." *Doe ex rel, Magee v. Covington County School Dist. Ex rel. Magee*, 675 F.3d 849, 867 (5th Cir. 2012). This court notes that, even if a constitutional violation by an officer could somehow be proven, then, in order to hold the City liable for that violation, plaintiffs would still have the additional hurdle of proving that the violation was made pursuant to an official municipal policy or custom. *See Monell v. Dep't of Soc. Serv.,* 436 U.S. 658, 694 (1978). A "policy or custom" can be either (1) a policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or (2) a persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. *McGregory v. City of Jackson*, 335 Fed. App'x. 446, 448-449 (5th Cir. 2009).

In their brief, plaintiffs attempt to resurrect their claims against Wigfall by arguing that his act of reckless driving constituted a substantive due process violation for which the City should be liable. Plaintiffs argue that the Supreme Court's decision in *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 833, 118 S. Ct. 1708, 1710, 140 L. Ed. 2d 1043 (1998) supports liability in this context, but this court disagrees. Indeed, the Supreme Court in *Lewis* rejected the argument that the officer in that case should have been held liable for alleged recklessness in driving his automobile, and this court sees no facts in this case which would warrant a different result here. Moreover, plaintiffs acknowledge that Wigfall was off duty at the time of the accident, but they appear to have forgotten that, earlier in their brief, they conceded that this fact means that § 1983

is inapplicable here.  This earlier concession by plaintiffs was entirely proper since, once again, § 1983 only applies to acts committed "under color of state law."  Plaintiffs have offered no arguments or authority that Wigfall was acting under color of state law when he was driving his personal vehicle to work, and this fact necessarily precludes any § 1983 liability on the part of the City for the manner in which he drove that vehicle while off-duty.

Finally, even if none of the above bars to recovery existed, the fact remains that any such conduct by Wigfall would not have been made pursuant to any city policy or custom.  In their brief, plaintiffs cite a city policy that "requires Police Officers to behave off-duty the same as if they are on duty.  In other words, the Municipal has a policy affecting the Police Officer's off-duty conduct."  [Brief at 10].  Thus, plaintiffs acknowledge once again that Wigfall was off-duty at the time of the accident, and, in so doing, they ignore the multiple bars to recovery arising from this fact.  Even if these bars did not exist, this court can discern no logic behind an argument that a policy that "requires Police Officers to behave off-duty the same as if they are on duty" somehow was the moving force behind an act of reckless driving by an officer.  Indeed, the policy in question seems to require the exact opposite of the sort of reckless conduct which plaintiffs accuse Wigfall of engaging in, and their entire "policy or custom" argument thus strikes this court as being rather nonsensical.

It is thus clear that there are multiple bars to plaintiffs' attempts to hold the City liable under federal law for the off-duty actions of Wigfall in this case, and the same could be said for his efforts to hold the City liable for the actions of Hoover and Muirhead in investigating the accident and preparing the police report.  In so stating, this court reiterates its finding that plaintiffs' brief blatantly mis-states the facts surrounding this claim when it incorrectly asserts that Hoover claimed to have witnessed the accident, which support a dismissal of the claim

against the City arising out of this misrepresentation as well. This aside, this court has previously found that no genuine fact issues exist regarding whether Hoover and Muirhead intentionally sought to falsify a police report, and it has likewise concluded that no substantive due process violation occurred in this regard. These facts likewise preclude any liability on the part of the City. Moreover, even if these bars did not exist, plaintiffs have cited no city policy or custom which might have led the defendant officers to falsify a policy report. Plaintiffs' federal claims against the City are thus due to be dismissed in their entirety.

Having dismissed all of plaintiffs' federal claims, this court must now decide whether it should retain jurisdiction over their remaining state law claims. In a case such as this one, where all federal claims are dismissed prior to trial, 28 U.S.C. § 1367(c)(3) grants this court discretion to decline to exercise supplemental jurisdiction over the remaining state law claims. Indeed, the Fifth Circuit has noted that the "general rule favor(s) dismissal of state claims when the federal claims to which they are pendent are dismissed," *See Guzzino v. Felterman*, 191 F.3d 588, 595 (5th Cir. 1999). For the reasons discussed below, this court concludes that it should follow the general rule in this case.

Section 1367(c) provides that:

The district courts may decline to exercise supplemental jurisdiction [if] (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

This court notes that the four § 1367(c) factors are listed in the disjunctive; only one of them need be met in order to grant a district court discretion to exercise supplemental jurisdiction. In addition to these statutory factors, federal law also requires consideration of the "common law factors [of] judicial economy, convenience, fairness, and comity" in deciding whether to exercise

supplemental jurisdiction. *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988).

In the court's view, the statutory factors, as well as the *Cohill* considerations, support declining to exercise supplemental jurisdiction in this case. With regard to the first § 1367 factor, this court concludes that the state law claims in this case involve difficult issues of state law which are heavily based upon public policy considerations which are of local, rather than federal, concern. In their brief, plaintiffs raise a number of rather complex legal issues involving state law, some of which involve rather complex provisions of the Mississippi Tort Claims Act, see Miss. Code Ann. §§ 11–46–7(2) and § 11–46–9(1)(d). In the court's view, there is clearly a strong state interest in determining the liability of municipalities in this state for the actions of their off-duty employees, and there is likewise a strong state interest in determining the circumstances under which police officers may be held liable under state law for inaccurate statements contained in accident reports.

In the court's view, there are difficult state law issues in this case regarding the application of § 11–46–7(2)'s provision for determining whether a particular employee was acting in the course and scope of his employment, and of the discretionary functions exception set forth in § 11–46–9(1)(d). These are, in this court's experience, two of the most difficult provisions in the MTCA, and the case law interpreting these provisions is often inconsistent. This court regards these and a number of other issues as raising difficult questions of state law, and it concludes that Mississippi courts have an interest in resolving those issues. Considerations of comity counsel in favor of this court allowing them to do so. With regard to the second § 1367(c) factor, this court concludes that state law claims predominate in this case, since it is, at its heart, a simple automobile accident case which plaintiffs have unsuccessfully

sought to transform into a federal lawsuit. Finally, this court concludes that the comity factors discussed above constitute "exceptional circumstances" within the meaning of the fourth § 1367(c) factor, and they likewise support a conclusion that the *Cohill* factors are met. Thus, this court concludes that multiple § 1367(c) factors support declining to exercise supplemental jurisdiction over this case, even though only one of them is required in order to do so. This court therefore declines to exercise supplemental jurisdiction over plaintiffs' state law claims, and they will be dismissed without prejudice.[4]

In light of the foregoing, defendants' motion for summary judgment is granted in part, and plaintiffs' federal claims asserted in this case are hereby dismissed with prejudice. This court declines to exercise supplemental jurisdiction over plaintiffs' remaining state law claims, and those claims are hereby dismissed without prejudice.

A separate judgment will be entered this date, pursuant to Fed. R. Civ. P. 58.

SO ORDERED, this the 12th day of March, 2020.

/s/ Michael P. Mills
UNITED STATES DISTRICT JUDGE

---

[4] This court cautions plaintiffs and their counsel to be aware of the tolling provisions set forth in 28 U.S.C. § 1367(d) in deciding when to re-file their state law claims in state courts. This subsection provides that:
> (d) The period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.